AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Meta Platforms, Inc., located at 1 Meta Way,<br>Menlo Park, CA 94025 (host of Facebook account<br> "Madelein Villanueva" ID # 61551569444467) | )<br>)<br>)<br>)<br>)<br>)    Case No.    **24-mj-02225** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference,

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960, 963 | Importation of a Controlled Substance and Conspiracy |

The application is based on these facts:

See attached affidavit of HSI Special Agent Aron Marcellus, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Aron Marcellus, HSI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 06/07/2024 _____

_____
*Judge's signature*

City and state: San Diego, California

U.S. Magistrate Judge Daniel E. Butcher
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Aron Marcellus, Special Agent with Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

### I

### INTRODUCTION

1.      I submit this affidavit in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), and Fed. R. Crim. Proc. 41 to search the following Facebook User Account (referred to herein as the **Target Account**), as further described in Attachment A, and seize evidence, fruits and/or instrumentalities of violations of 21 U.S.C. §§ 952, 960, and 963, as further described in Attachment B, for the period from December 22, 2023, through March 22, 2024:

Facebook Account "Madelein Villanueva"
ID # 61551569444467

The **Target Account** is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1 Meta Way, Menlo Park, CA 94025.

2.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 952, 960, and 963 have been committed by Madelein Villanueva ("VILLANUEVA") and that a search of the **Target Account** as described in Attachment A will produce evidence, fruits and/or instrumentalities of those violations, as further described in Attachment B.

3.      The information in this affidavit is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the target offenses.  The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case.  Since this affidavit is being submitted for

the limited purpose of securing a search warrant, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause.   Dates and times are approximate.

## II

## TRAINING AND EXPERIENCE

4.    I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code. I have been employed as an HSI Special Agent since September of 2017. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

5.    During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.  Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

6.    Through the course of my training, experience, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for drug smugglers to work in concert with other individuals and to do so by utilizing social networking and messaging applications like Facebook through digital devices like tablets, cellular telephones, and computers, to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distribution amount quantities of hard drugs, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling controlled substances across the

border are in digital or telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Drug smugglers and their organizations use cellular and digital devices, in part, because these individuals believe law enforcement cannot track the originating and destination communications.

7.      I have become familiar with Facebook and other social media sites through my investigations.  I have examined many Facebook accounts, and I have learned that suspects often use social media sites for communications in an effort to bypass law enforcements attempts to uncover their criminal activity. Based on my training, experience, and communications with other law enforcement officers, I have learned specific techniques in being able to identify suspects and associates even when they use fictitious names or aliases within social media sites. Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.      Drug smugglers will use social networking and messaging services on different electronic devices because it allows access to send instant messages and communicate with other individuals in addition to the standard use of cellular phones to make telephone calls, text, web, and voice messages;

b.      Drug smugglers will use social networking and messaging services because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

c.      Drug smugglers and their accomplices will use social networking and messaging services features because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d.      Drug smugglers will use social networking and messaging services to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e.      Drug smugglers will use social networking and messaging services to notify or warn their accomplices of law enforcement activity to include the presence and

posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

f.     The use of social networking and messaging services by smugglers tends to generate evidence that is stored on the social media account, including, but not limited to chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

III

**BACKGROUND INFORMATION ON META AND FACEBOOK**

8.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

9.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

10.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

11.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

12.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

13.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

14.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats.  Facebook users can also post comments on the

Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

15.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

16.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

17.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

18.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

19.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

20.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

21.     Meta also retains records of which Internet Protocol (IP) addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

22.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

23.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

24.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the

account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

25. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**IV**

**FACTS IN SUPPORT OF PROBABLE CAUSE**

26. On March 22, 2024, at approximately 8:16 PM, VILLANUEVA, a United States citizen, applied for entry into the United States from Mexico through the Otay Mesa, California, Port of Entry via the pedestrian lanes.

27. According to a report written by Customs and Border Protection Officer ("CBPO") Adeola Akinde, she was assigned to pedestrian primary and received two negative Customs declarations from VILLANUEVA, who also stated she was crossing the border to go to San Diego, California. CBPO Akinde noticed what appeared to be a bulge in VILLANUEVA's stomach area concealed underneath her jacket. CBPO Akinde referred and escorted VILLANUEVA to pedestrian secondary for a pat down by a female officer. Before the pat down was conducted, VILLANUEVA stated, "I will be honest, I am carrying an item on me." VILLANUEVA was then placed in handcuffs and escorted by CBPO Akinde and another officer to the security office.

28.     According to a report written by CBPO Lara Delia, she conducted a full pat down of VILLANUEVA in the security office and immediately felt multiple packages taped to VILLANUEVA's torso.   CBPO Delia discovered two cellphones on VILLANUEVA, one in a back pocket of her jeans and another in the pocket of her sweater.   CBPO Delia and another officer then escorted VILLANUEVA into a private room to continue the full pat down.   While CBPO Delia continued the pat down search, VILLANUEVA stated, "They know where I am, they won't stop bugging me, I don't want them to hurt my mom, I didn't want to do this."   VILLANUEVA removed three packages from her torso, each of which was wrapped with black tape and clear plastic. The packages were being held to VILLANUEVA's torso with a clear tape with blue writing.   Officers took pictures of the packages around VILLANUEVA's torso and of the packages after being removed.   The gross weight of the packages was determined to be 1.48 kilograms (3.26 pounds).

29.     According to a report written by CBPO Daisy Perez, she was assigned to the vehicle secondary lot on March 22, 2024, and was notified of the possible seizure of narcotics from VILLANUEVA.   The three packages removed from VILLANUEVA's torso were turned over to CBPO Perez, who cut open one package and observed a clear, crystal-like substance.   CBPO Perez field-tested the substance utilizing the Gemeni and observed a positive response for the characteristics of methamphetamine.   A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine.

30.     VILLANUEVA was placed under arrest at approximately 9:10 p.m. and subsequently charged via complaint for importation of a controlled substance, in violation of Title 21, United States Code, Sections 952 and 960.

31.     Two cell phones were found and seized by a Customs and Border Protection Officer (CBPO) who was tasked to perform a secondary inspection of VILLANUEVA and inventory all the property seized from the Defendant. The two cell phones were found by the CBPO in Defendant's rear pocket and sweater pocket.

32.     CBP Task Force Officer Leticia Casillas and I responded to the Port of Entry and made contact with VILLANUEVA.  We identified ourselves to VILLANUEVA and advised her of her Miranda rights both verbally and in writing, which she waived.  In her post-arrest statement, VILLANUEVA admitted knowledge of the narcotics concealed on her person but claimed that two individuals had forced her to smuggle the narcotics as repayment for a failed smuggling attempt three weeks earlier.  VILLANUEVA claimed to have been staying with a friend to avoid those two individuals since the failed smuggling attempt, but they located her the day before and told her that she had to cross the narcotics as repayment.  On the day of her arrest, VILLANUEVA claimed the two individuals picked her up and told her to cross the narcotics and deliver them to an unknown individual at McDonald's before returning to Mexico.  VILLANUEVA stated that her mother lives in San Diego and that neither of the two individuals can cross into the United States legally.  When asked why she did not enter the United States to get away from those individuals, VILLANUEVA was unable to provide a reasonable answer.

33.     VILLANUEVA gave consent to search her two cell phones.  During a cursory review, we found conversations suggesting that VILLANUEVA was in a romantic relationship with one of the individuals she claimed forced her to smuggle the narcotics, which she then admitted.  She also claimed that three of her friends could corroborate her story that she had been forced to smuggle the narcotics.  We were able to find contact information for two of the friends in VILLANUEVA's phone and called them, but they were unaware of any details regarding the smuggling event.  We were unable to find any information for the third friend, who was the same person that VILLANUEVA claimed to have been staying with for the past three weeks.

34.     A federal search warrant was issued on March 25, 2024, for both cell phones found on VILLNUEVA.[1]  During a cursory search of the phone downloads, investigators

---

[1] Due to a technical issue at the time of arrest, VILLANUEVA's phones could not be downloaded using the Cellebrite machine.  Therefore, investigators later obtained search warrants for both phones, which were then downloaded using a Cellebrite machine.

discovered a conversation on the Facebook Messenger cellphone application for the **Target Account** where VILLANUEVA appears to discuss smuggling narcotics on a previous occasion.  The following is part of a larger conversation that took place between VILLANUEVA and a contact named "Cee Nun" on March 19, 2024, and March 20, 2024, two days before VILLANUEVA's arrest:

Villanueva:  I'm crossing today
Villanueva:  Es una onza (*Its'an ounce*)
Villanueva:  Y me la estan vendiendo en 1000 pesos *(And they are selling it to me for a 1000 pesos)*
Villanueva:  Cuanto Vale una onza de crico en San Diego (*How much is an ounce of "crico"[2] worth in San Diego*)
Villanueva:  ?????

Cee Nun:    Cristal?

Villanueva:  Crico
Villanueva:  Yeah

Cee Nun:    Fetty[3]

Villanueva:  Oh yeah about that
Villanueva:  Moving that around almost had me killed
Villanueva:  I'm still looking out for myself yk there was a couple things that went down but is all good now

Cee Nun:    wtf u mean
Cee Nun:    Smh this is why I told you shit smh
Cee Nun:    Exactly why I didn't wanna do shit for you, I don't want anything to happen to you

---

[2] Based on my training and experience, I know that "crico" is slang for crystal meth.

[3] Based on my training and experience, I know that "fetty" is slang for Fentanyl.

Villanueva:  Ik but that was because my homegirl did me shady bc I lagged on the payment so she came to conclusion I had spent the money

Cee Nun:    Did you?

Villanueva:  No I gave the money to the guy the day you sent it
Villanueva:  But It was like 5 days. Later

35.    I believe, based on my training, experience, and knowledge of the particular facts of this case, that the acquisition of the Meta data will assist investigators in determining the extent of Defendant's involvement, and other yet unidentified associates or co-conspirators in the smuggling of methamphetamine, or some other federally controlled substances.

36.    I also believe, based on my training and experience, it is not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Account** for data beginning on December 22, 2023, up to and including March 22, 2024.

**V**

**PRIOR ATTEMPTS TO OBTAIN DATA**

37.    As previously discussed, law enforcement briefly reviewed VILLANUEVA's two cell phones pursuant to her consent at the time of her arrest but was unable to download them using a Cellebrite machine due to technical issues at the time of arrest.  Based on a federal search warrant and subsequent Cellebrite download, law enforcement was able to obtain some information from the **Target Account** through from the Facebook and Facebook Messenger applications on one or both of the phones. However, Cellebrite was not able to obtain all of the information from the cell phone applications that is requested herein for the **Target Account**.  No prior warrants or requests have been submitted to Meta for the information sought herein.

## VI

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

38.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the Government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## VII.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

39.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Meta are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of Meta for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta. The impact on Meta's business would be disruptive and severe.

40.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from **Target Account**, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta, to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, Homeland Security Investigations seeks authorization to allow Meta to make a digital copy of the entire contents of the account(s) subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged, and the image will then be analyzed to identify communications and other electronic records subject to seizure

pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

41. Analyzing the data to be provided by Meta may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

42. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by Meta, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

43. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all

electronic mails that identify any users of the **Target Account** and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

44.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VIII.

## CONCLUSION

45.     Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violation of Title 21, United States Code, Sections 952, 960, and 963, and will be found at the location to be searched as provided in Attachment A.

46.     Because the warrant will be served on Facebook who will then compile the requested records and information at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Aron Marcellus, Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 7th day of June, 2024.

_____
HON. DANIEL E. BUTCHER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Items to be Searched

Meta Platforms, Inc., ("Meta") is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1 Meta Way, Menlo Park, CA 94025.

Meta hosts the following electronic communication account that is the subject of this search warrant and application: Facebook account "Madelein Villanueva" with Facebook account ID 61551569444467.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Service of Warrant**

The officer executing the warrant shall permit Meta Platforms, Inc. ("Meta"), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.     Information to be disclosed by Meta**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to law enforcement officers for each user ID listed in Attachment A, for the period from December 22, 2023, through March 22, 2024:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All Internet Protocol ("IP") logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account;

(m)   All information about the user's access and use of Facebook Marketplace;

(n)   The types of service utilized by the user;

(o)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within fourteen days of service of this warrant.

## III.   Information to be seized by law enforcement

The search of the data supplied by the ISP pursuant to this warrant will be conducted by Homeland Security Investigations as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of December 22, 2023, through March 22, 2024, and to the seizure of:

(a)   Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to discuss, establish, or further drug trafficking or conspiracies to commit the same;

(b)   Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to identify any co-conspirators;

(c)     Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

(d)     All photos and videos tending to establish or further drug trafficking or conspiracies to commit the same, identifying potential co-conspirators, or providing context to any relevant communications, records, photos, or videos or received or sent in temporal proximity to any relevant electronic mail; and

(e)     Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters related to the criminal activity under investigation, including records that help reveal their whereabouts;

which are evidence of violations of 21 U.S.C. §§ 952, 960, and 963.